# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JIMMIE JOHNSON,

        Petitioner,

        v.                          Case No. 06-C-357

WILLIAM POLLARD,

        Respondent.

## ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

Jimmie Johnson ("Johnson") is incarcerated pursuant to the judgment of a state court and seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On April 19, 2006, this court screend Johnson's petition in accordance with Rule 4 of the Rules Governing Section 2254 Cases and ordered the responded to answer the petition. On May 17, 2006, the respondent answered the petition. The pleading on Johnson's petition are closed and the matter is ready for resolution. The parties have previously consented to the full jurisdiction of a magistrate judge.

**FACTS**

On May 1, 2002, following a jury trial, Johnson was convicted of two counts of first-degree reckless homicide and three counts of first degree recklessly endangering safety, all as a party to the crime, in violation of Wisconsin Statutes § 939.05, 940.02(1), and 941.30(1). (Ans. Ex. A.) Johnson was also convicted of one count of possession of a firearm by a felon, in violation of Wisconsin Statute § 941.29(2). (Ans. Ex. A.) For the homicide counts, he was sentenced to 40 years of initial and 10 years of extended supervision. (Ans. Ex. A.) As to the recklessly endangering safety counts, Johnson was sentenced to 5 years initial confinement and 3 years of extended supervision. (Ans.

Ex. A.) As for the felon in possession of a firearm count, he was sentenced to 2 years initial confinement and 2 years extended supervision. (Ans. Ex. A.) The court ordered all these sentences to run consecutively with the exception of two of the recklessly endangering safety counts, for a total term of initial confinement of 87 years initial confinement and 26 years of extended supervision. (Ans. Ex. A.)

Johnson appealed, and on September 9, 2003, the court of appeals affirmed Johnson's conviction. (Ans. Ex. G.) On November 17, 2003, the Supreme Court of Wisconsin denied review. (Ans. Ex. H.)

Johnson then filed a collateral attack to his conviction pursuant to Wisconsin Statute § 974.06. On November 15, 2005, the court of appeals summarily affirmed the trial court. (Ans. Ex. B.) On January 20, 2006, the Wisconsin Supreme Court denied review. (Ans. Ex. C.)

Johnson seeks relief on four grounds. Johnson contends that his first ground for relief is that he was denied his Fourth Amendment right to present a defense, though this seems to be a mischaracterization of his actual grounds for relief. It appears that Mr. Johnson is alleging, rather, that his Fourteenth Amendment right to due process was violated by the State because he claims he was denied his right to present a defense. In support of this ground Johnson argues that the trial court mistakenly denied his request to present evidence of a third party being the shooter, and denied his request for adjournment in order to locate a missing witness that would corroborate his third party shooter defense. Johnson's second ground for relief is that his Fifth Amendment rights were violated by the admission of his confession to police. Johnson contends that the confession was coerced by police and is, therefore, inadmissible. Johnson's third ground for relief is that he was denied his Sixth Amendment right to counsel because of ineffective assistance of trial counsel. Johnson's fourth ground for relief is that he was denied his Sixth Amendment right to counsel because of ineffective assistance of appellate counsel. Johnson contends that his appellate counsel

was ineffective because he did not raise, on appeal, the issue of ineffective assistance of trial counsel. The same counsel represented Johnson at both the trial and appellate levels.

The following relevant facts are contained in the court of appeals' decision regarding Johnson's direct appeal:

> On September 30, 2000, around 2:00 a.m., two men were fatally shot and three men were wounded outside the Cream City Tavern in Milwaukee. At trial, Terry Farmer, a security guard at the tavern, testified that on September 30, 2000, a man wearing a grey shirt, jeans, and a tan hat tried to get into the tavern around 1:50 a.m. Farmer told the man that he could not come in because the tavern was closing. According to Farmer, the man then tried to hand a beer to a woman waiting outside. Farmer claimed that the woman startled, raised her hand, and caused the beer bottle to hit the man in the lip.
>
> Farmer testified that the man's lip began to bleed. According to Farmer the man said "I should get something started" after people began to tease him about the incident. Farmer claimed that he turned to go back to the tavern doorway, heard gunshots, and ducked. When he looked up, he saw the man "just standing there" while everyone else was on the ground. Farmer testified that he heard the man say, "there's something started now."
>
> Jemial Battle, a disc jockey at the tavern, testified that he was standing in front of a truck parked near the tavern around 2:00 a.m. when he heard shots. He then heard a man, whom he believed was the shooter, yell "Now what, now what?" Battle could not see the man's face, but testified that he had a "blackish-grey" sweatshirt on.
>
> Shyrell Caldwell, the owner of the tavern, testified that he saw a man whom he knew as "Jimmie" in front of the tavern around closing time. According to Caldwell, Jimmie's face was bleeding and a man whom he knew as "Red" was teasing him about it. Caldwell testified that, after Jimmie began to mumble about causing trouble, he told Jimmie to "take the stuff up the road somewhere" because he did not want trouble in front of the tavern. As Caldwell turned to go back inside, he heard five or six shots. According to Caldwell, when he looked up, he saw Jimmie "just standing there." He then heard Jimmie say "Yeah, how do you like that" before he walked away. Caldwell later told the police that Jimmie was wearing a grey hooded sweatshirt, black pants, and a brown baseball hat.
>
> Vicko Battle, Caldwell's brother-in-law and a tavern employee, testified that he was outside the tavern around 2:00 a.m. when he saw a man whom he identified at trial as Johnson. According to Battle, Johnson's face was bleeding "pretty badly" so he gave him a towel. Battle testified that about five minutes later he took the garbage out and started walking up and down the sidewalk on the side of the building to make sure the customers left. According to Battle, he was standing on the sidewalk when he heard five or six shots. As he walked toward the front of the building he

saw a man in a grey sweatshirt and dark pants walking away with a gun in his hand. He testified that he thought that the gunman was Johnson because he was wearing the same grey sweatshirt he saw earlier.

On October 2, 2000, the police arrested Johnson on two city commitments. Detectives interviewed Johnson approximately five times from October 2, 2000, to October 4, 2000. During the first two interviews, Johnson denied that he was involved in the shootings. On the morning of October 3, 2000, Johnson took a polygraph examination. In an interview after the examination, Johnson confessed that he was the gunman.

Johnson filed a motion to suppress his confession. He claimed that the confession was inadmissible because it was impermissibly related to the polygraph examination. The trial court held a hearing on the motion. Detectives Clint Harrison and Timothy Heier conducted the second interview with Johnson. The interview started on October 2, 2000, at 9:47 p.m. and ended on October 3, 2000, at 2:47 a.m. Heier testified that Johnson told them he was wearing a grey hooded sweatshirt, black pants, and a brown baseball hat. Heier also testified that Johnson told them that he had nothing to do with the shootings and that he would prove it by taking a polygraph examination the next day.

Detective Charles Hargrove conducted the polygraph examination of Johnson on October 3, 2000. The examination began at approximately 11:15 a.m. and ended at approximately 2:58 p.m. Hargrove testified that, when the examination was finished, he detached Johnson from the polygraph machine and told him that the test was over. Johnson signed a polygraph examination agreement and release form that provided, as relevant: This examination was concluded at 2:58 p.m. on the above date. I completely affirm in its entirety my above agreement. In addition, I knowingly and intelligently continued to waive all my rights, including those in paragraph (2) above, and I willingly made all statements that I did make. I also understand that any questions I may be asked after this point in time, and any answers I may give to those questions, are not part of the polygraph examination.

Hargrove testified that he then took Johnson to a different room.

Detectives William Jessup and Heier conducted a third interview with Johnson. Jessup testified that the interview started at 6:24 p.m. on October 3, 2000, and ended at 9:08 p.m. Heier testified that, at the beginning of the interview, he told Johnson: "It's my understanding you must have failed that polygraph because you're still here." According to the detectives, they did not review the polygraph charts with Johnson and there were no polygraph machines in the room.

Johnson confessed during the interview. According to his statement, he was outside the Cream City Tavern when a woman accidentally bumped him and caused a beer bottle that he was holding to cut him near his nose. Johnson told the detectives that he became upset because people were laughing at him and his nose was bleeding. According to the statement, "K" then handed a gun to him and he fired several shots

in the direction of the crowd "to make [the people] scatter." Johnson told the police that he then saw a car stop and a group of men get out. One of the men from the car and another man on the sidewalk near the car pulled out guns and started to fire at him. According to Johnson's statement, he ducked. When he looked up, the car was driving away.

The trial court concluded that Johnson's confession was admissible:

> Under the analysis of this case, because of the fact that the polygraph was in the polygraph suite, the Heier interview was in [room] 419 at the extreme opposite end of the floor, there had been at least the passage of three and a half hours between the end of the polygraph and the commencement of the Heier interview, the fact that Heier's statement was made in passing, the fact that the defendant did not offer a dramatic or significant response to that, the fact that the statement of Heier does not specifically say you failed the test, the fact that all of those facts, under the totality of the circumstances, convince me that … the third statement to Jessup and Heier is admissible.

State v. Johnson, 2003 WI App 225, ¶¶2-12 (per curiam) (unpublished).

**STANDARDS OF REVIEW**

Where the state court adjudicates the merits of a petitioner's claim, this court may grant habeas corpus relief if the state court decision:

> (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As the Supreme Court explained in Williams v. Taylor, § 2254(d)(1) establishes two independent grounds on which a federal court can grant habeas corpus relief: (1) if a state court decision is "contrary to" clearly established federal law, as determined by the Supreme Court, or (2) if a state court decision involves an "unreasonable application" of clearly established federal law, as determined by the Supreme Court. 529 U.S. 362, 404-05 (2000); see also Washington v. Smith, 219 F.3d 620, 627-28 (7th Cir.2000). The "contrary to" standard requires a state court decision to be

"substantially different from the relevant precedent of [the Supreme Court]." Williams, 529 U.S. at 405. For example, a state court decision applying a rule that contradicts the governing law set forth by the Supreme Court would qualify, as would a decision that involves a set of facts materially indistinguishable from a Supreme Court case that arrives at a different result. Id. at 405-06. By contrast, a state court decision that draws from Supreme Court precedent the correct legal rule and applies it in a factually distinguishable situation will not satisfy the "contrary to" standard, no matter how misguided the decision's ultimate conclusion. Id. at 406-07.

Under the "unreasonable application" prong of (d)(1), relief may be granted if the petitioner shows that, despite identifying the correct rule of law, the state court unreasonably applied it to the facts of the case. Williams, 529 U.S. at 404. An unreasonable application of federal law, however, is different from the incorrect or erroneous application of federal law. Boss v. Pierce, 263 F.3d 734, 739 (7th Cir. 2001) (citing Williams, 529 U.S. at 410). A federal court simply disagreeing with the state court decision does not warrant habeas relief-the decision's application of Supreme Court precedent must be so erroneous as to be objectively unreasonable. Middleton v. McNeil, 541 U.S. 433, 436 (2004); Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

Under § 2254(d)(2), relief may be had where the petitioner demonstrates that the state court made an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Here again, an unreasonable determination is more than a determination that is simply incorrect or erroneous. Moreover, state court factual determinations are presumed correct, and the petitioner has the burden of rebutting the presumption of correctness by "clear and convincing evidence." § 2254(e)(1). Rice v. Collins, 546 U.S. 333, 339 (2006) (citing Miller-El v. Dretke, 545 U.S. 231, 240 (2005)).

-6-
Case 2:06-cv-00357-AEG    Filed 02/13/08    Page 6 of 14    Document 10

ANALYSIS

**Right to Present Defense**

In support of this ground, Johnson argues that the trial court mistakenly denied his request to present evidence of a third party being the shooter and denied his request for adjournment in order to locate a missing witness that would corroborate his third party shooter defense.

In affirming the trial court's decision regarding these issues, the court of appeals noted that there was insufficient evidence to support Johnson's theory that someone else was the gunman. Relying upon state law, the court held that before a defendant is able to present evidence that another person was the shooter, he must satisfy the "legitimate tendency" test, i.e., that the other person had a motive and the opportunity to commit the crime, and provide evidence to "directly connect the third person to the crime charged which is not remote in time, place or circumstances." Johnson, 2003 WI App 225, ¶21 (quoting State v. Denny, 120 Wis. 2d 614, 622-25, 357 N.W.2d 12, 16-17 (1984)). The court of appeals held that the police report relied upon by Johnson in an offer of proof wherein a witness who could not be located at the time of trial discussed an earlier confrontation between two groups of people at the bar failed to satisfy this test. Id. at ¶¶19-24. The court also affirmed the trial court's refusal to grant an adjournment as within the discretion of the trial court. Id. at ¶26.

In Holmes v. South Carolina, 126 S. Ct. 1727 (2006), the Supreme Court held that courts are permitted to establish evidentiary rules limiting a defendant's ability to implicate another person in the crime with which he is charged so long as those limitations serve a legitimate purpose and the results are not disproportionate to the ends served. Id. at 1733. The Court noted that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Id.

In light of this standard, this court is unable to say that the standard adopted by the Wisconsin courts and its application in this case was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, Johnson is not entitled to relief on this ground.

**Admission of Confession**

Johnson alleges that his confession was inadmissible because it was closely related to his polygraph examination. The court of appeals affirmed the trial court and stated:

> The polygraph examination and the post-polygraph confession were sufficiently discrete. Hargrove testified that, after the polygraph examination was complete, he told Johnson that it was over. Johnson also signed a release form which provided "that any questions I may be asked after this point in time, and any answers I may give to those questions, are not part of the polygraph examination." Thus, Johnson was told and acknowledged that the test was over.
>
> Moreover, the trial court found that Johnson was taken to a different room and interviewed approximately three and one-half hours after the polygraph examination. Johnson does not challenge these findings. Thus, the post-polygraph interview was distinct both as to time and location from the polygraph examination. Heier's comment to Johnson that "you must have failed that polygraph because you're still here" does not alter our analysis. "[A] truthful comment to a suspect, either volunteered by the officer or in response to the suspect's question, does not override the other factors that we have used consistently to determine whether a defendant's post-examination statements should be suppressed." [State v. Greer, 2003 WI App 112, ¶17, 265 Wis. 2d 463, 666 N.W.2d 518] Moreover, the statement was a truism; Johnson was still there and that reasonably meant that he had not passed the polygraph examination.

Johnson, 2003 WI App 225, ¶¶32-33.

In the factually similar case of Oregon v. Bradshaw, 462 U.S. 1039, 1042 (1983), the Supreme Court found no constitutional defect when a defendant confessed to a crime after being led to believe that he failed a polygraph examination. Id. at 1042. Like Johnson, the defendant in Bradshaw repeatedly denied his culpability throughout numerous prior interrogations. Id. at 1041-

42. However, unlike Johnson, in an earlier interrogation Bradshaw invoked his right to counsel. Id. Even despite this additional factor, the Court held that Bradshaw's subsequent confession was nonetheless voluntary and therefore admissible because Bradshaw had re-initiated contact with the police and had been appropriately re-advised of his Miranda rights before being subjected to the polygraph examination. Id. at 1042-43.

In light of the Bradshaw precedent, this court is unable to say that there was any constitutional error in Johnson's interrogation. Therefore, this court is certainly unable to say that the decision of the court of appeals was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly, Johnson is not entitled to relief on this ground.

**Ineffective Assistance of Counsel**

Johnson alleges that his trial counsel was ineffective for (1) not calling Johnson as a witness in the evidentiary hearing regarding Johnson's motion to suppress his confession; (2) failing to impeach the detectives with the fact that a police report indicated that they gave Johnson cigarettes but Johnson did not smoke; (3) failing to secure the testimony of the witness whom Johnson alleges would have supported his third-party shooter defense; (4) stipulating to a jury instruction "that plainly identified Johnson as a felon;" (5) did not object to an amendment in the information to allege that Johnson acted as a party to the crime; and (6) by advising Johnson not to testify at trial.

Johnson's claims regarding impeachment of the detectives (except as it relates to counsel's failure to call Johnson as a witness) and amendment of the information were not raised on appeal and therefore Johnson has not exhausted his state remedies with respect to these claims. (See, Ans. Exs. B, D.) Thus, Johnson's petition is a mixed petition and ordinarily, the "court must dismiss habeas petitions containing both unexhausted and exhausted claims." Lundy, 455 U.S. at 522.

However, in light of the one-year statute of limitations imposed upon a dismissal of Johnson's petition would result in Johnson forever forfeiting his ability to pursue his exhausted claims. Rhines v. Weber, 544 U.S. 269, 275 (2005). Therefore, the court may stay the federal court proceedings to permit a petitioner to exhaust his state court remedies but only if a petitioner has demonstrated good cause for the petitioner's failure to exhaust state remedies. Id. at 277. Alternatively, the court may permit a petitioner to withdraw his unexhausted claims and proceed only with is exhausted claims. See Lundy, 455 U.S. at 520 ("[A petitioner] can always amend the petition to delete the unexhausted claims, rather than returning to state court to exhaust all of his claims.").

The petitioner has failed to demonstrate good cause for his failure to exhaust state court remedies with respect to his third and fourth claims for relief. Therefore, the court finds that it would be inappropriate to stay Johnson's petition to permit him to return to state court to exhaust these claims. Thus, the court shall deny these claims for Johnson's failure to exhaust state remedies and shall turn to the two claims for which Johnson has exhausted his state remedies.

Turning to the merits of Johnson's remaining claims, to prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that the Wisconsin court's decision was either contrary to, or based on an unreasonable application of, federal law. Williams v. Davis, 301 F.3d 625, 631 (7th Cir. 2002) (applying § 2254(d)(1) standards). The applicable federal law governing ineffective assistance claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Strickland requires the petitioner to show: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) the deficient performance caused him prejudice. 466 U.S. at 687-88 (1984); Roche v. Davis, 291 F.3d 473, 481-82 (7th Cir.2002); Montenegro v. United States, 248 F.3d 585, 590 (7th Cir. 2001). Courts review counsel's performance under the first prong deferentially, presuming reasonable judgment unless the factual record rebuts such a presumption. See Strickland, 466 U.S. at 689; Matheney v. Anderson, 253 F.3d 1025, 1039 (7th Cir.2001).

With regard to the prejudice element, the petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. See Strickland, 466 U.S. at 689; Matheney, 253 F.3d at 1039-40. If the court finds that the counsel's alleged deficiency did not prejudice the defendant under the second prong, the court need not consider the first prong of the Strickland test. Berkey v. United States, 318 F.3d 768, 772 (7th Cir. 2003).

With respect to Johnson's claims regarding his counsel's failure to call him as a witness during the evidentiary hearing, the court of appeals held that his counsel's performance was not unreasonable in light of the fact that the probability of obtaining suppression of Johnson's statement was very low, and if he had suggested that Johnson testify in a "futile" suppression hearing, it may have compromised his ability to testify at trial if he chose to do so. (Ans. Ex. B at 4.) Specifically, the court of appeals noted that Johnson's trial counsel was concerned that Johnson repeatedly changed his story and might confess on the stand. (Ans. Ex. B at 4.)

This court concludes, as did the court of appeals, that it was entirely reasonable for Johnson's attorney to advise him not to testify during the suppression hearing, and thus Johnson is unable to show that he was denied the effective assistance of counsel.

As for Johnson's claim regarding his counsel's alleged failure to secure the testimony of a witness, the court of appeals noted that Johnson's trial counsel sought and obtained a body attachment for the witness after the witness failed to appear in response to a defense subpoena. (Ans. Ex. B at 3.) Despite this body attachment, the police were nonetheless unable to find him. Thus, the court of appeals concluded, "The fact that he was not found does not provide any basis for faulting counsel." (Ans. Ex. B at 3.)

In addition to finding that counsel's performance was not unreasonable, the court of appeals noted that Johnson failed to demonstrate that he was prejudiced because the witness's prior

-11-
Case 2:06-cv-00357-AEG   Filed 02/13/08   Page 11 of 14   Document 10

statement indicated that he witnessed a separate incident that occurred fifteen-minutes before the shooting; there was no indication that the witness saw the shootings. (Ans. Ex. B at 3-4.)

This court agrees with the court of appeals. Johnson is unable to demonstrate that his counsel's performance was unreasonable; counsel did as much as he could. Second, Johnson is unable to demonstrate prejudice. In addition to the reasons cited by the court of appeals, the court notes that, as discussed above, the trial court had previously held that the witness's testimony was inadmissible and thus it was inconsequential whether or not the witness was located.

As for Johnson's claim that his trial counsel was ineffective for stipulating to a jury instruction "that plainly identified Johnson as a felon," the court finds no merit in Johnson's argument. The court of appeals noted that Johnson's attorney stipulated to substitution of the word "felon" with "person not authorized to possess a firearm" in the jury instructions for the charge of felon in possession of a firearm because the instruction permitted the jury to infer the Johnson was a felon. (Ans. Ex. B at 5.) The alternative to the stipulated change would have been that the jury would have been explicitly told that Johnson was a felon. Further, Johnson is also mistaken that the jury would have necessarily inferred that Johnson was a felon. There are many other reasons that a person may be prohibited from possessing a firearm such as a prohibition as a condition of bond, having been convicted of a misdemeanor crime of domestic violence, having been dishonorably discharged from the military, or having been involuntary committed to a mental health facility. Johnson's counsel's actions were entirely reasonable, in fact, arguably the sort of steps that should be ordinarily favored, in that he kept the jury from learning that Johnson was a convicted felon, and instead did the best he could by creating the possibility that if the jury wished to speculate, a felony conviction was just one of many reasons as to why Johnson would have been prohibited from possessing a firearm.

Johnson's argument regarding his counsel's stipulated amendment of the jury instructions is particularly meritless in light of Johnson's final claim for relief regarding his wish to testify at trial. If Johnson had testified at trial, almost certainly the fact that he had previously been convicted of a crime would have been presented to the jury. Johnson's allegation that his trial counsel was ineffective for advising him not to testify is additionally meritless because Johnson explicitly and thoroughly waived his right to testify on the record. The trial transcript contains the following colloquy:

> THE COURT: [D]oes your client wish to testify?
> [DEFENSE COUNSEL]: He will advise the Court that he's going to exercise his right not to testify.
> THE COURT: Is that right, Mr. Johnson?
> THE DEFENDANT: Yes.
> THE COURT: You've got a constitutional right either way.
> THE DEFENDANT: I don't want to testify. That's it.
> THE COURT: I've got to ask you some questions. I have to say this all on the record. You have a constitutional right to testify if you want to and you have a constitutional right not to testify. Do you understand those rights?
> THE DEFENDANT: Yes, I do.
> THE COURT: Okay. Have you talked this over with your lawyers?
> THE DEFENDANT: I do not want to testify.
> THE COURT: That's not my question. My question was have you talked this over with your lawyers?
> THE DEFENDANT: Yes.
> THE COURT: Okay, and how far did you get in school?
> THE DEFENDANT: I'm a half credit short of graduating.
> THE COURT: You can read and write, right? Yes?
> THE DEFENDANT: Yes.
> THE COURT: All right. So do you have any questions about your constitutional right to testify?
> THE DEFENDANT: No.
> THE COURT: Okay, and does your client's decision - - is that against your advice or with your approval . . . ?
> [DEFENSE COUNSEL]: Thank you, Your Honor. I have probably met with my client at the Milwaukee County Jail on six or seven occasions prior to the last two weeks reviewing decision with him and we've discussed it probably seven or eight times in the last two weeks. Following all those discussions I consulted with [defense co-counsel] as well, it is my recommendation and my client independently as well as [defense co-counsel's] and my joint recommendation to our client not to testify and apparently he has accepted out recommendation.
> THE COURT: Okay. Is that the way is happened, Mr. Johnson?

> THE DEFENDANT: Yes, ma'am.
> THE COURT: Now, they don't get to decide this for you, though, its got to be your call. Do you understand that?
> THE DEFENDANT: Listen, I tell you something, I do not want to testify. That's it.
> THE COURT: That's okay, I'm not trying to talk you into testifying.
> THE DEFENDANT: I'm not listening to you right now. I'm listening to myself. I don't want to testify. That what got me in trouble in the first place talking with him. I didn't do none of this.
> THE COURT: You made it clear. The record is clear. The record is clear that the defendant has considered his options. He understands he has a constitutional right to testify. He is certainly competent to make that decision and he is choosing upon the advice of his lawyers but clearly independent of his lawyers as well not to testify and the record will so reflect.

(Ans. Ex. L, 49 at 97-99.)

It is clear that Johnson's decision not to testify was his own, and therefore he is unable to demonstrate that his trial counsel was ineffective by advising him not to testify. Therefore, with respect to all of Johnson's exhausted claims regarding ineffective assistance of counsel, this court is unable to say that the decision of the court of appeals was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, Johnson is not entitled to relief on any of these grounds.

**IT IS THEREFORE ORDERED** that Johnson's petition for a writ of habeas corpus is **denied**. The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of February, 2008.

s/AARON E. GOODSTEIN<br>
U.S. Magistrate Judge